UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert C. JACOBY and Thomas Skubal,
Defendants–Appellants.

No. 89–6210.

United States Court of Appeals,
Eleventh Circuit.

March 25, 1992.

---

---

Marcia Silvers, Miami, Fla., for Robert C. Jacoby.

Benedict P. Kuehne, Sonnett, Sale & Kuehne, P.A., Miami, Fla., for Thomas Skubal.

Dexter W. Lehtinen, U.S. Atty., Miami, Fla., Lothar Genge, Linda Collins Hertz, Alice Ann Burns, Asst. U.S. Attys., Ft. Lauderdale, Fla., for U.S.

Before COX, Circuit Judge, DYER and FRIEDMAN *, Senior Circuit Judges.

* Honorable Daniel M. Friedman, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

FRIEDMAN, Senior Circuit Judge:

This criminal prosecution arose from the mid-eighties financial debacle of the Sunrise Savings and Loan Association (Sunrise) in South Florida. A jury convicted two former Sunrise officials of several financial crimes involving Sunrise. They challenge their convictions on various grounds: that evidence was improperly admitted and excluded, that prosecutorial misconduct denied them a fair trial, that one of the defendants improperly was denied a severance of his trial, that the evidence was insufficient to support the conviction of one defendant, and that the instructions on one of the crimes charged were erroneous. We reject all of these contentions, and affirm both convictions.

I

In 1987, a federal grand jury indicted three former Sunrise officers, including the appellants, and two of Sunrise's largest borrowers, William Frederick and Thomas Moye. (The third indicted officer, William Frame, suffered a heart attack during trial; his case was severed and will be retried.) Jacoby was Sunrise's president and chairman of its board of directors; Skubal was vice-president of Sunrise Mortgage Corporation, a wholly-owned subsidiary of Sunrise.

The indictment charged that from January 1983 to July 1985, Jacoby and Skubal engaged in a series of closely related acts calculated to conceal the dubious financial condition of Frederick and Moye from Sunrise's board of directors, from federal and state banking regulators, and from the public. The jury convicted Jacoby of one count of conspiring to misapply bank funds, in violation of 18 U.S.C. § 657 (Supp. I 1989); seven counts of misapplying funds, in violation of that section; five counts of making false statements in documents relating to loan transactions, in violation of 18 U.S.C. § 1014 (Supp. I 1989); and two counts of making false entries in loan delinquency reports, in violation of 18

U.S.C. § 1006 (Supp. I 1989). It convicted Skubal of one count of conspiring to misapply funds, in violation of 18 U.S.C. § 657, and four substantive counts of misapplying funds under that section.

The district court sentenced Jacoby to five and a half years imprisonment and Skubal to three years imprisonment, followed by four years probation for each of them.

The evidence at trial implicated Jacoby and Skubal in an elaborate series of criminal transactions involving Sunrise management's efforts to conceal Frederick and Moye's true, and dire, financial condition, and its serious effect upon Sunrise. A summary of that evidence, viewed most favorably to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), follows.

A. *Background.* Sunrise commenced operations in 1980; the Federal Savings and Loan Insurance Corporation (FSLIC) insured its deposits. Jacoby was Sunrise's president from the beginning, and became chairman of its board of directors in 1983. Skubal joined Sunrise in November 1983, and became vice-president of Sunrise Mortgage Corporation shortly thereafter. In that position, Skubal was responsible for determining whether loans complied with federal regulations, and for construction disbursements.

Frederick and Moye were co-owners of Commercial Center Development Corporation, a real estate company involved in the development of strip shopping centers, and formed subsidiary "shell" corporations for planned centers. They entered into a banking relationship with Sunrise in 1982; by mid-1984 Sunrise had loaned Frederick, Moye, and their companies more than $150 million, and Sunrise was their exclusive lender.

The Boca Raton, Florida branch of the Philadelphia law firm of Blank, Rome, Comisky and McCauley (Blank, Rome), was involved substantially in Sunrise's formation, organization and day-to-day operations until Sunrise was declared insolvent in 1985 and the government took it over.

Under FSLIC regulations, Sunrise's total loans to any one borrower could not exceed approximately $50 million at any given time. Sunrise circumvented these regulations by treating Frederick and Moye as separate entities, and by advancing loans to nominee third parties, including employees and relatives of Frederick and Moye, for the benefit of Frederick and Moye.

In early 1984, when interest reserves on millions of dollars in loans Sunrise made in 1982 and 1983 became depleted, representatives of the FSLIC and the Florida Comptroller's Office met with Sunrise's board of directors regarding problems with Sunrise's loan practices, including loans made to Frederick and Moye. At the meeting, the Sunrise board executed a supervisory agreement designed to assure Sunrise's adherence to prudent and safe banking practices in making loans. One provision of the agreement required that, as a prerequisite to approval, all future loans greater than $500,000 include specific supporting documentation demonstrating compliance with underwriting and credit requirements.

B. *Misapplication of Construction Funds.* In April 1984, Frederick and Moye purchased at a Christie's auction in New York City several expensive jewelry items, including a twenty-six carat diamond ring for $1,375,000. Moye paid for these items with a worthless personal check for approximately $1,829,000. Shortly thereafter, Frederick met with Sunrise officers in Jacoby's office to find a way to pay for the ring. Jacoby and Skubal agreed to consider whether construction funds could be disbursed to Frederick.

After the meeting, Frederick signed and Skubal approved two construction draw requests for $700,000 and $600,000, on two previously approved construction loans for Frederick and Moye's shopping center projects. Neither of these loans authorized disbursement of funds to pay for a diamond. Frederick testified that Jacoby expressly approved the use of these construction funds to pay for Moye's ring to get them out of their "dilemma."

C. *Concealment of Overdrafts.* In late 1983, a Sunrise branch manager discovered that Frederick's personal account became overdrawn by $100,000 within a few days. When the manager spoke to Sunrise's corporate office about the overdraft, she was informed that headquarters "would take care of it." Following this incident, the branch manager received her instructions regarding Frederick's accounts from Sunrise's corporate office, primarily from Skubal. The daily overdraft reports she received no longer included Frederick's overdrafts, although all other account overdrafts were shown.

The bank's normal practice where accounts were substantially overdrawn for more than one week, was to close the account and turn it over to Sunrise's attorneys for collection.

By June 30, 1984, Frederick's personal checking account was overdrawn by $2,895,851.92. Frederick's and Moye's accounts, collectively, were overdrawn by $4,132,564.

Throughout 1984, Skubal or Frame approved overdrafts on Frederick's accounts almost daily. During this period, Frederick and his companies gave Sunrise twenty-six worthless overdraft checks, totaling $923,-980, for interest payments on Frederick's Sunrise loans, a practice designed to make the loans appear current and to remove them from Sunrise's monthly loan delinquency reports. The millions of dollars in overdrafts were the equivalent of unsecured loans from Sunrise to Frederick and Moye.

Neither Jacoby nor Skubal had authority to approve the overdrafts. Only Sunrise's board of directors could do so, and the board never was informed of the overdrafts. These overdrafts were never reported to the state and federal regulators who reviewed Sunrise's operations.

By June 1984, the Frederick and Moye overdrafts, and the concealment of them from regulators and the Sunrise board, was so serious that Jacoby told Frederick that if Frederick did not find a way to cover the overdrafts, Jacoby "would probably lose his job." At the same time, Frederick's financial position worsened to the point that he was unable to make interest payments on approximately $150 million in Sunrise loans. In the Spring of 1984, Frame demanded that Frederick give Sunrise interest checks drawn on other banks for the interest payments, regardless of whether these checks were "good."

When Frederick brought in these worthless personal checks drawn on other banks, he met with Jacoby, Frame, and Special Loans Manager Lonnie Merrill. Frame, and then Jacoby, ordered Merrill to "post," or deposit, the checks. For several months thereafter, Frederick brought in worthless personal checks at the end of each month. Sunrise processed the checks at the end of each month, and its computer-generated loan delinquency reports therefore showed Frederick and Moye's loans as current.

Between May and July of 1984, Frederick brought Merrill and Frame more than $1.6 million in worthless checks, drawn mostly on out-of-state banks. These checks were posted as interest payments on Frederick and Moye's Sunrise loans. As a result, Merrill was able to prepare delinquency reports for Sunrise's board of directors in June, July, and August that omitted millions of dollars of Frederick and Moye's delinquent loans.

D. *Loan Manipulations to Remove Overdrafts from Sunrise's Books.* In late Summer 1984, Sunrise's auditors discovered the $4,132,564 in overdrafts on Frederick and Moye's personal accounts, and informed Jacoby that unless the overdrafts were satisfied by August 31, 1984, they would be unable to give Sunrise an "unqualified" rating in its annual report.

Following the auditors' discovery of the overdrafts, a meeting was held among Jacoby, Skubal, Frame, Frederick, Sunrise's executive vice president Joseph Tabor, and Ronald Berkovitz, a representative of Alpha Capital Group. After rejecting Tabor's proposal to loan Frederick the funds to pay off the overdrafts, it was decided that Sunrise would make six or seven loans of $500,000 to various persons, which they would use to purchase property from Frederick and Moye, and Frederick and Moye

would in turn use the funds to pay off the overdrafts.

The borrowers, Charles Powell, Virginia Valosin, and Meryl Wood, were selected randomly from persons those at the meeting knew. Frederick stated that he would pay the interest on the loans; Jacoby instructed Skubal and Tabor to "get it done." Skubal then assembled a set of loan documents, consisting of what appeared to be duly executed commitment letters, lines of credit approvals, promissory notes, mortgages, warranty deeds, and loans-to-one-borrower statements.

On August 30, 1984, Powell, of Alpha Capital, signed loan documents for three $500,000 loans in connection with his "purchase" of three properties in Maryland and Florida. Powell never submitted applications and financial statements for these loans, and he had never visited the three properties he was "buying" from Frederick.

On the same day, Frederick informed his cousin and employee, Valosin, that she might be "needed to sign some documents at Sunrise later on that day," and that unless she signed, "there would be foreclosures." Valosin then signed a commitment letter (executed earlier by Skubal and Tabor), a promissory note, a mortgage, and a loans-to-one-borrower statement granting her a $500,000 loan; her personal net worth at the time was "less than a thousand dollars." Valosin never received any proceeds from this loan, and never was able to make the contractually required interest payments of more than $5,000 a month. She testified that she executed the loans-to-one-borrower statement "at the direction of someone else," that the representations in that document that she was not acting as a nominee were false, and that, contrary to the representations in the commitment letter prepared in her name, she had never given any financial information upon which that letter could have been based.

Wood was Frederick's yacht broker. On August 30, 1984, Frederick brought Wood to the Boca Raton office of Blank, Rome. Dana Scheer, a Blank, Rome attorney, asked Wood to sign a stack of documents and not read them. Wood signed the papers, which were documents for a loan of $305,000 from Sunrise. Wood did not understand why he was asked to sign the documents, and he did not understand that he supposedly was purchasing real estate. Even though he never gave a financial statement, the commitment letter he signed stated that such a statement had been prepared and approved.

Because of title defects regarding several of the properties involved in these transactions, such as unreleased first mortgages in favor of Sunrise and Frederick's execution of deeds even though he was not the owner of record, Valosin and Powell received worthless deeds.

This practice of loaning $500,000 or less to third parties who "bought" real estate from Frederick and Moye accomplished several purposes: (1) The loans were not "Frederick loans" even though he received the beneficial interest; (2) Sunrise's board of directors did not have to approve them; and (3) the loans avoided the underwriting documentation the supervisory agreement required. At closing, the funds to which Frederick would have otherwise been entitled from these real estate transfers were immediately transferred to Sunrise and deposited in Frederick's checking accounts, thus removing Frederick's overdrafts by the close of business August 31, 1984.

E. *Sunrise's Seawalk Purchase.* The August 30 loans removed Frederick's overdrafts from Sunrise's books, but serious loan delinquency problems remained. In early Fall 1984, $70 to $80 million of Frederick's loans were seriously delinquent. To ameliorate Frederick's cash flow problems, Sunrise's management proposed that Sunrise purchase certain shopping centers that Frederick either had completed or were under contract. The board agreed and closing was set for late September.

One of the properties involved was 33 acres of undeveloped commercially zoned land in Hallandale Beach, Florida, referred to as "Seawalk." Sunrise had loaned Frederick and Moye the funds to acquire Seawalk in 1983.

Sunrise purchased Seawalk from Frederick for $13.5 million on September 28, 1984. The purchase price was calculated by adding three components: (1) the approximately $10 million required to pay off Frederick's original Seawalk loan; (2) $3 million necessary to make interest payments on Frederick's loans; and (3) $500,000 that Frederick demanded as part of the deal. Following the purchase, approximately $3 million of the purchase funds were paid to Sunrise to bring all of Frederick's accounts current.

After a special board meeting on October 3, 1984 at which the board ratified the Seawalk purchase, two sets of minutes of the meeting were prepared. An unsigned version stated: "The property has an appraised value of thirteen and a half million prepared by Benton and Associates." The version that Jacoby signed stated: "The property has an appraised value of $14,750,000 prepared by Pomeroy Appraisal Associates of Florida, Inc."

Sunrise management told Tabor, who supported this proposal, not to worry about the Seawalk purchase price because Frederick had obtained a $14.75 million appraisal for the property and it would soon be purchased from Sunrise. Tabor testified that he had never seen an appraisal of the Seawalk property from Benton and Associates or from Pomeroy Appraisal Associates. On October 3, 1984, the only appraisal of the Seawalk property on file was for $10.182 million, which Failla Associates prepared in 1983 to support Frederick's original loan to purchase Seawalk.

It was only after Sunrise purchased Seawalk from Frederick that Sunrise's management asked Frederick for an appraisal of Seawalk. In mid-October, after the Seawalk closing, Frederick obtained the Pomeroy appraisal for $14.75 million, an appraisal shown at trial to have many deficiencies. Alvin Benton, of Benton and Associates, testified that, contrary to the unsigned minutes, he had not appraised Seawalk before Sunrise purchased it, and was not asked to appraise Seawalk until October 3, 1984, five days after the purchase. Seawalk was later appraised at $8.5 million,

and sold to a third party for $8 million in 1988 by the Federal Asset Disposition Association.

Federal regulators questioned Jacoby in November 1984 about Sunrise's Seawalk purchase. Jacoby stated that he had the $14.75 million Pomeroy appraisal and "a feel" for the property, that Frederick and Moye received no cash from the deal, and that the proceeds were used only to repay Frederick's original loan and to make delinquent loans current.

## II

### Admission and Exclusion of Evidence

■ A. *The Scheer Memorandum.* Jacoby's principle contention on appeal is that the district court committed reversible error when it received into evidence a memorandum to the file prepared by Blank, Rome attorney Dana Scheer, an associate in the Boca Raton office.

1. Scheer was deeply involved in Sunrise's day-to-day operations. The memorandum, dated August 29, 1984, which Scheer initialed, related to the "Frederick Work Out." It stated:

I was requested by Rob Jacoby in a telephone conversation on this date (Rob Jacoby was in New York) to close each of these loans. Mr. Jacoby indicated that he had presented these loans before Executive Committee in evening session August 28, 1984, and had received their approval. Mr. Jacoby indicated that upon his return to Palm Beach he would immediately sign and forward a memo authorizing me to close these loans notwithstanding having no surveys, appraisals, title commitments, utility letters, permits, opinions of counsel, and notwithstanding the fact that by making several of these loans we might be violating doing business laws in the State of Maryland and placing mortgages on parcels which were not legally able to be subdivided in the event of foreclosure. Mr. Jacoby indicated that no Board approval would be necessary for any of these loans and that it was necessary to immediately close as soon as possible. A let-

ter to file has been dictated by me and is in Mr. Jacoby's office awaiting his return.

The loans to which this memorandum referred were the seven loans of $500,000 or less to Powell, Valosin, and Wood for the purchase of real estate, closed on August 30, 1984 and designed to remove Frederick's overdrafts from Sunrise's books by August 31, 1984.

The memorandum was offered in conjunction with the testimony of Tabor, Valosin, Wood, Berkovitz, and Frederick to demonstrate that the August 30, 1984 loans were fixed at $500,000 or less to circumvent the Sunrise board and the underwriting and documentation requirements of the supervisory agreement, and that the loans were closed at Jacoby's direction and with his awareness of the deficiencies in and problems with the loans.

The government contended that the memorandum was admissible under two exceptions to the hearsay rule: (1) the business records exception, Fed.R.Evid. 803(6); and (2) the residual hearsay exception for declarants who are unavailable as a witness, Fed.R.Evid. 804(b)(5). Because Scheer declined to testify on the basis of his fifth amendment privilege against self-incrimination, he was unavailable as a witness.

Jacoby opposed admission under either theory, contending that the document did not meet the requirements of the business records exception, and that it was inadmissible under the residual exception because it lacked adequate guarantees of trustworthiness and raised sixth amendment confrontation clause problems.

The district court questioned admissibility under the business records exception, because "it is not a routine type of thing." The court, although stating it was "not an easy question," admitted the memorandum under the residual exception of Rule 804(b)(5), finding that "it does have the necessary ingredients of authenticity and the words used, guarantees of trustworthiness, circumstantial guarantees of trustworthiness are sufficient to justify its admission" and "I do think it is relevant."

2. In admitting the memorandum, the district court did not hold it inadmissible under the business records exception. It merely questioned its admissibility under that exception, but did not decide the question because it admitted the memorandum under the residual exception of Rule 804(b)(5).

We conclude, however, that the memorandum was admissible under the business records exception (which, the government stated in its brief in this court, page 33, footnote 41, it continued to rely upon), and we therefore need not determine its admissibility under Rule 804(b)(5).

■ Upholding the admission of the memorandum on a ground other than that of the district court is here appropriate. In *U.S. v. Williams*, 837 F.2d 1009 (11th Cir.), *cert. denied*, 488 U.S. 965, 109 S.Ct. 490, 102 L.Ed.2d 527 (1988), the trial court admitted hearsay evidence in a criminal case evidence under the business records exception. On appeal, the government conceded that the memoranda were not admissible under that exception, but argued that they were admissible as admissions of a party. *Id.* at 1012. This court held that the evidence was admissible as a party-admission, even though the government had not urged that theory in the district court, on the ground that the admission under either theory "served the same purpose," namely "to permit the introduction of evidence proving the truth of the matter asserted." *Id.* at 1013. *See also United States v. Rosenstein*, 474 F.2d 705, 710–11 (2d Cir.1973) (affirming admission of evidence improperly admitted at trial under business records exception where evidence properly admissible as party admission and admission under either theory served the same purpose).

In the present case, as in *Williams*, the admission of the evidence under the business records exception "served the same purpose" as its admission under Rule 804(b)(5). It was introduced to establish "the truth of the matter asserted," namely, that Jacoby had made to Scheer the statements the memorandum set forth. Indeed, the present case is even stronger for up-

holding the admission of the evidence on a different ground than was *Williams.* In *Williams,* the court of appeals upheld the admission on a ground the government had not provided in the district court. Here, on the other hand, we uphold the admission on the ground the government had asserted in the district court, but which the district court did not accept.

3. Federal Rule of Evidence 803(6) provides:

> The following [is] not excluded by the hearsay rule ...:
>
> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

*See United States v. Hawkins,* 905 F.2d 1489, 1494 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991); *EEOC v. Alton Packaging Corp.,* 901 F.2d 920, 926 (11th Cir.1990).

The government laid a foundation for the introduction of the Scheer memorandum under the business records exception through the testimony of Lucy Holton, a real estate paralegal in the Blank, Rome, office where Scheer worked, and Lessie Youngquist, Scheer's legal secretary, who worked exclusively for him. Holton stated that Scheer would "from time to time dictate memos to the file explaining his actions in a particular closing" if "anything needed explaining in the closing;" that if "something needed explaining," it was his "habit" to "do a memo to the file"; that such memos would "be done at or about

the time" of the transaction; and that it was the regular course of business of Blank, Rome and of Scheer to keep such a memorandum in the Blank, Rome files. She testified that Scheer did not prepare such memoranda for every transaction in which he was involved, but did so "more than occasional[ly]," but not "day in and day out."

Youngquist authenticated the memorandum as one that Scheer dictated and initialed and that she typed. She testified that Scheer would dictate memoranda to his files of notes and concerns regarding transactions as often as once a week or twice a month, or possibly only once a month, or perhaps occasionally, that Scheer dictated these memos in the regular course of business, and that is was his regular practice to do so. She recollected that this memorandum was dictated and typed on August 29, 1984. She testified that, normally, less than one hour would elapse between Scheer's dictation and her typing of it. She stated that other Blank, Rome attorneys also "engage[d] in that same practice from time to time."

This evidence established that: (1) Scheer dictated and Youngquist typed the memorandum on August 29, 1984 (the memorandum was "made at or near the time by, or from information transmitted by, a person with knowledge"); (2) it was Scheer's regular practice to dictate memoranda to his files whenever something about a transaction needed to be explained or noted ("it was the regular practice of that business activity to make the memorandum"); and (3) it was Scheer's and Blank, Rome's practice to maintain these memoranda in the files as part of the regular course of business (it was "kept in the course of a regularly conducted business activity").

■ In admitting the Scheer memorandum under Rule 804(b)(5), the district court found that "it does have the necessary ingredients of authenticity and the words used, guarantees of trustworthiness, circumstantial guarantees of trustworthiness are sufficient to justify its admission." This finding is not clearly erroneous, and it satisfies the requirement in the business

records exception that such a record is admissible if it meets the other requirements of Rule 803(6)—and we have held that the Scheer memorandum does so— "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Neither the "source of information" the document contained—a telephone conversation with Scheer's client, Jacoby—nor the "circumstances of preparation"—a frequent act by Scheer in the practice of his profession— "indicate lack of trustworthiness."

Moreover, Jacoby's own testimony on cross-examination supports the district court's finding of trustworthiness. He testified that he knew of no reason why the content of Scheer's memorandum would have been less than truthful, that the memorandum "was probably a standard sort of letter to the file," that the memorandum indicated they were "missing some documentation" for the loans, and that it was "urgent" that they close the loans by August 30.

Jacoby argues that Scheer had the motive to fabricate the memo to cover himself if he were accused of improprieties in connection with the closing of the Powell loans. On the other hand, an associate in a large firm whose client instructed him to close loans with serious flaws the following day—and, as we have shown, closing the Powell loans on August 30th was critical to the Sunrise management scheme to conceal the company's seriously-flawed financial position—would be most likely to write a memorandum to the files, of the type that Scheer did, explaining that he had closed the loans only in response to his client's direction. Other Blank Rome attorneys also wrote such memoranda to record special circumstances. In the language of Rule 803(6), neither "the source of information" contained in the Scheer memorandum "[n]or the method or circumstances of preparation indicate lack of trustworthiness."

4. The problem the district court discerned in considering the admissibility of the Scheer memorandum under the business records exception was that the memorandum was "not a routine type of thing." Jacoby challenged its admissibility as a business record essentially for the same reason, arguing that it did not record a routine transaction and indeed was "prepared because of a non-routine event."

■ The routiness or repetitiveness with which a record is prepared is not the touchstone of admissibility under the business records exception. ". . . Rule 803(6) should be interpreted so that the absence of routineness without more is not sufficiently significant to require exclusion of the record. Nonroutine records made in the course of a regularly conducted 'business' should be admissible if they meet the other requirements of Rule 803(6) unless 'the sources of information or other circumstances indicate lack of trustworthiness.'" 4 J. Weinstein and M. Berger, *Weinstein's Evidence* § 803(6)[03], at 803–182 (1991) [hereinafter *Weinstein's Evidence*]. It is significant, and essential to admissibility under this exception, that the record be the product of a "regular practice" of the business, *see United States v. Freidin,* 849 F.2d 716, 719–22 (2d Cir.1988), in the "usual course" of that business. *See Hawkins,* 905 F.2d at 1494 ("Admission of hearsay under this exception requires evidence 'sufficient to support the trustworthiness of the document, and to prove that it was prepared in the usual course of business.'") (quoting *United States v. Parker,* 749 F.2d 628, 633 (11th Cir.1984)). These elements are present in the Scheer memorandum.

■ The evidence was that whenever Scheer believed it necessary to explain something or make a record of an unusual circumstance, he prepared a memorandum to the file. A significant part of his "regularly conducted business activity" was the closing of real estate loans and transfers and he frequently dictated memoranda to the files as part of that activity.

We are guided by the Advisory Committee Notes to Rule 803(6), which state:

> The element of unusual reliability of business records is ... supplied by ... actual experience of business in relying upon them, or by a duty to make an

accurate record as part of a continuing job or occupation.... The model statutes and rules have sought to capture these factors and to extend their impact by employing the phrase "regular course of business," in conjunction with a definition of "business" far broader than its ordinary accepted meaning. The result is a tendency unduly to emphasize a requirement of routineness and repetitiveness and an insistence that other types of records be squeezed into the fact patterns which give rise to traditional business records. The rule therefore adopts the phrase "the course of a regularly conducted activity" as capturing the essential basis of the hearsay exception....

(Citation omitted).

The record leaves no doubt that Scheer prepared his memorandum in "the course of a regularly conducted business activity" in which it was "the regular practice" to make such memoranda. The Scheer memorandum was properly admissible under the business records exception to the hearsay rule in Rule 803(6).

█ 5. Our ruling that the Scheer memorandum was admissible under the business records exception makes it unnecessary to consider Jacoby's argument, made in support of his contention that the memorandum was improperly admitted under the residual exception because it was unreliable, that admission of the memorandum violated his Sixth Amendment right to confront the witnesses against him.

In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court ruled that although the confrontation clause ordinarily requires the prosecution to establish the unavailability of the declarant and indicia of the reliability of a hearsay statement as prerequisites to its admission, no independent inquiry into reliability is required if the evidence "falls within a firmly rooted hearsay exception." *Id.* at 65–66, 100 S.Ct. at 2538–2539.

Subsequently, in *United States v. Inadi,* 475 U.S. 387, 399–400, 106 S.Ct. 1121, 1128–1129, 89 L.Ed.2d 390 (1986) and *Bourjaily v. United States,* 483 U.S. 171, 182, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987), the Court ruled that the admission of statements of a co-conspirator made during the course and in furtherance of the conspiracy did not violate the confrontation clause because, as the court stated in *Bourjaily,* "the co-conspirator exception to the hearsay rule is firmly enough rooted in our jurisprudence that, under ... *Roberts,* a court need not independently inquire into the reliability of such statements." 483 U.S. at 183, 107 S.Ct. at 2782. More recently, the Court held that two other hearsay exceptions, for spontaneous declarations and statements made for purposes of medical diagnosis, are "firmly enough rooted" to satisfy the reliability requirements of the Confrontation Clause. *White v. Illinois,* —— U.S. ——, 112 S.Ct. 736, 742 n. 8, 116 L.Ed.2d 848 (1992).

This court recently held that the prosecution is not required to demonstrate the unavailability of the declarant or independent indicia of reliability when evidence falls within the business records exception. "By analogy [to *Bourjaily* ], we find the business records exception to the hearsay rule to be 'firmly enough rooted in our jurisprudence" to satisfy the requirements of the Confrontation Clause...." *United States v. Norton,* 867 F.2d 1354, 1363 (11th Cir.), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 and 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989)

Because the memorandum was admissible under the business records exception, its use against Jacoby did not violate the confrontation clause.

B. *Merrill's Grand Jury Testimony.* 1. Merrill, Sunrise's former special loans manager, testified on direct examination that sometime in the Summer of 1984, following a meeting in Frame's office with Jacoby, Frame, and Tabor, Frame directed him to accept Frederick's worthless checks as interest payments on Frederick's loans. Merrill testified that after he stated that he could not post the checks because they were not "any good," "Jacoby told me to post them."

On cross-examination, Jacoby confronted Merrill with his grand jury testimony regarding that meeting. In that testimony, Merrill stated that after Frederick brought in the requested check, "I was instructed to put it in the computer." Merrill was then asked with whom he had that discussion. His response was: "... Bill Frame and I believe Joe Tabor was present. I wouldn't swear to that but I believe Joe Tabor was present."

Jacoby had attempted to introduce the grand jury transcript as evidence pursuant to Federal Rule of Evidence 801(d)(1)(A) as a prior inconsistent statement "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding." Jacoby sought to use that grand jury testimony as substantive evidence that he was not present at that meeting, and therefore did not order the posting of the worthless checks. The district court refused to admit the transcript into evidence, but permitted defense counsel to read the transcript verbatim to the jury on cross-examination of Merrill and to quote it in his summation.

■ 2. Jacoby contends that the district court erred in refusing to admit the grand jury transcript as an exhibit and in refusing to instruct the jury that prior inconsistent statements made under oath are admissible as substantive evidence, i.e., that such statements can be considered as though they were made at trial.

Federal Rule of Evidence 801(d)(1)(A) provides that

[a] statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding,....

Prior inconsistent statements meeting the requirements of this rule are admissible as substantive evidence. *See Weinstein's Evidence* ¶ 801(d)(1)(A), at 801–136–37. The rule covers statements made to a grand jury. *Id.*

We do not view Merrill's grand jury testimony as "inconsistent" with his trial testimony. Merrill's grand jury testimony, as quoted by defense counsel at trial, does not show that Merrill was asked whether Jacoby was present at the 1984 meeting at which Merrill was instructed to deposit worthless checks. He was asked with whom he had the conversation in which he was so instructed, and he answered that Frame and perhaps Tabor were present. He never stated that Jacoby was not present at the meeting. At trial, Merrill testified, consistent with the grand jury testimony, that Frame ordered him to deposit the checks. He then testified, for the first time, that after he refused Frame's instruction, Jacoby told him to do so.

Merrill testified in much greater detail about this meeting at trial than he did before the grand jury. Indeed, based upon the portions of the grand jury testimony quoted in the record, the focus of that testimony may not have been on who was present at the meeting, but on whether Merrill was ordered to post worthless checks. "To testify later in greater detail in response to detailed questions is not inconsistent, especially when the added detail was not crucial to the earlier conversation." *United States v. Leach*, 613 F.2d 1295, 1305 (5th Cir.1980).

■ In any event, even if the district court should have admitted Merrill's grand jury testimony into evidence, its failure to do so was harmless and not prejudicial to Jacoby. The court permitted Jacoby to impeach Merrill by reading verbatim the transcript of Merrill's grand jury testimony. Jacoby thus was able to develop fully before the jury the alleged inconsistencies between the witness' trial and grand jury testimony. The defense also quoted Merrill's grand jury testimony in summation. In fact, the defense made substantive use of the grand jury testimony in its summation, inviting the jury to conclude that Merrill's statements before the grand jury were the truth, and that his trial testimony was a mistake. In the circumstances, the district court acted within its discretion in excluding from evidence the transcript of

Merrill's grand jury testimony, *see United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir.1983), Jacoby was not prejudiced by the exclusion, and the district court was not required to instruct the jury that it could consider Merrill's grand jury testimony as evidence.

## III

### Cross Examination Regarding the Forbes Magazine Article

■ In 1984, *Forbes* Magazine published an article based on an interview with Jacoby. The article attributed to Jacoby the statement, in the context of Sunrise's expansion into states where there were retirees, that "anywhere there's a flock of retirees[,] [i]t'll be like shooting ducks." Other statements by Jacoby in the article included: "I have a pretty wife, a Jaguar, a Mercedes, a beautiful home, a yacht. I want a Ferrari, a bigger house, a bigger boat. I want an airplane, an apartment in New York"; and that if all went according to his plan, by 1988 "I'll have a whole pile of money."

Prior to Jacoby's testimony, the government indicated it wanted to introduce the article as part of its case-in-chief. The district court refused to admit the article, but stated that it "could conceivably be relevant on rebuttal." When Jacoby testified in his defense, he stated, on direct examination, that the *Forbes* article painted a picture of him "that I didn't think was appropriate," and that some of his comments in the *Forbes* article were "facetious" and "off the record." Jacoby went on to explain, in some detail, many of his statements in the article.

Over Jacoby's objection, the court permitted the prosecutor to cross-examine Jacoby about various statements attributed to him in the *Forbes* article, including those quoted above. Jacoby contends that the district court improperly permitted the prosecutor to cross-examine him about the article and that the prosecutor misused Jacoby's statements in the article during closing argument to "inflame" the jury against him.

Although the district court initially ruled that the government could not introduce the *Forbes* article as part of its case, when Jacoby testified in his direct examination about the article, he "opened the door" to cross-examination about it by the government. *See United States v. Vigliatura*, 878 F.2d 1346, 1351 (11th Cir.1989). The cross-examination was designed to refute or discredit Jacoby's direct testimony giving his explanation of the statements in the article and, also, to discredit his general credibility.

The district court has broad discretion to determine the permissible scope of cross-examination and we review its rulings on that issue under an abuse of discretion standard. *In re McDonald*, 819 F.2d 1020, 1023 n. 4 (11th Cir.1987). Furthermore, the decision whether Federal Rule of Evidence 403 excludes evidence because its prejudicial effect outweighs its probative value also is vested in the sound discretion of the trial court. *Wilson v. Attaway*, 757 F.2d 1227, 1242 (11th Cir.1985). We cannot say that the district court abused its discretion in allowing this cross examination.

Nor did the prosecutor misuse Jacoby's *Forbes* comments in his closing argument. The prosecutor justifiably referred to the comments as inconsistent with Jacoby's trial testimony. Jacoby neither objected nor requested a curative instruction.

## IV

### Alleged Prosecutorial Misconduct

■ Both Jacoby and Skubal contend that the prosecutor engaged in misconduct that denied each of them a fair trial. Jacoby argues that the prosecutor improperly characterized Jacoby's testimony and improperly attacked the ethics and integrity of Jacoby's trial counsel. Skubal contends that certain comments of the prosecutor in his opening and closing arguments were improper.

A. The prosecutor stated in his closing argument:

The inconsistencies ... between Mr. Jacoby's testimony and that of a number of Government witnesses is [sic] so glaring

and so clear that it isn't just a mistake. Someone is committing perjury.... It is going to be for you to decide, who is that person or persons.

He also stated, in response to the testimony of two witnesses that Skubal and Frame, and not Jacoby, approved all the overdrafts: "Now, based upon the evidence you have heard, that's an absolute lie."

"The statements of a prosecutor will justify reversal of a conviction if they undermined "the fairness of the trial and contributed to a miscarriage of justice." *United States v. Obregon,* 893 F.2d 1307, 1310 (11th Cir.), *cert. denied,* [494] U.S. [1090, 110 S.Ct. 1833, 108 L.Ed.2d 961] (1990) (quoting *United States v. Sawyer,* 799 F.2d 1494, 1507 (11th Cir.1986) (per curiam)), *cert. denied [sub nom. Leavitt v. United States ],* 479 U.S. 1069 [107 S.Ct. 961, 93 L.Ed.2d 1009] (1987)." *United States v. Smith,* 918 F.2d 1551, 1562 (11th Cir.1990). Furthermore, a prosecutor's statements during closing argument require reversal only if "the comments are both improper and prejudicial to a substantial right of the defendant," *United States v. Rodriquez–Suarez,* 856 F.2d 135, 139 (11th Cir.1988), *cert. denied,* 488 U.S. 1045, 109 S.Ct. 875, 102 L.Ed.2d 998 (1989); *Obregon,* 893 F.2d at 1310, and we review such alleged misconduct in light of the "particular facts of the case and in the context of the entire record." *Smith,* 918 F.2d at 1562. We have also held that because the statements of counsel are not evidence, the district court may rectify improper prosecutorial statements by instructing the jury that only the evidence in the case is to be considered. *Id. (citing United States v. Barshov,* 733 F.2d 842, 847 (11th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 904, 83 L.Ed.2d 919 (1985)).

We conclude that the prosecutor's remarks, although colorful and perhaps flamboyant, were neither improper nor unduly prejudicial, and do not require reversal. In each instance the prosecutor asked the jury to consider, and draw its conclusions from, the evidence in the case. *See United States v. Moore,* 710 F.2d. 157, 159 (4th Cir.), *cert. denied,* 464 U.S. 862, 104 S.Ct. 192, 78 L.Ed.2d 169 (1983). Moreover, the district court properly instructed the jury: "[Y]ou must consider only the evidence that I have admitted in this case;" "[r]emember, folks, that any statements, objections or arguments 'made by the lawyers are not evidence in the case." *See Barshov,* 733 F.2d at 847. Because the prosecutor's remarks did not undermine the fairness of the trial or result in a miscarriage of justice, we discern no reversible error.

■ B. Jacoby contends that, during his closing argument, the prosecutor attacked the ethics and integrity of his trial counsel through various statements allegedly impugning counsel's trial strategy. Viewed in context, however, the prosecutor's remarks did not attack the ethics and integrity of Jacoby's counsel. The prosecutor mainly was simply commenting on the inability of Jacoby's defense, after all the evidence was presented, to support the position articulated in Jacoby's opening statement. These were permissible comments on the evidence in the case.

C. Skubal's claims of prosecutorial misconduct, which Jacoby adopted, fare no better. Some of the prosecutor's statements that Skubal challenges were, as the district court ruled, fair and appropriate. The court struck from the record comments that it considered improper and directed the jury to disregard them. As noted, the court also told the jury that statements of counsel were not evidence and that it was to consider only the evidence. No prosecutorial comment, taken in the context of the whole record, undermined the fairness of the trial or resulted in a miscarriage of justice for Skubal. *Smith,* 918 F.2d at 1562.

D. The trial of this case took seven weeks, and the prosecution delivered a lengthy opening summation which occupies 113 pages of the transcript and a shorter closing summary. Although both Jacoby and Skubal now attack a number of statements in the prosecutor's summation, at trial Jacoby did not object to any of the statements in the opening summation and only two of those in the closing summation. Skubal objected once during the opening

summation and once during the closing summation. In ruling on the four objections, the district court carefully considered them and explained the reasons for its decision. Jacoby and Skubal's failure to object to most of the prosecutor's arguments that they here challenge seriously weakens their present claim that those remarks were improper and prejudicial and denied them a fair trial. *See Russell*, 703 F.2d at 1243 ("Having failed to object to the prosecution's [closing] argument at trial, defendant can succeed only if the remarks were so prejudicial that they constituted plain or fundamental error."). The prosecutor's summation was vigorous, forceful and colorful, but it did not undermine "the fairness of the trial" or produce "a miscarriage of justice." *Obregon*, 893 F.2d at 1310.

## V

*Denial of Skubal's Motion for Severance*

Prior to trial, Skubal moved for a severance. The district court denied the motion, and also denied Skubal's two renewals of the motion during the trial. Skubal argues that during trial, "it became apparent that the case had little to do with" him, that much evidence was introduced at trial that had nothing to do with, but was highly prejudicial to him, and that his joint trial with Jacoby severely prejudiced him.

 "The general rule in this circuit is that defendants who are jointly indicted should be tried together, and this rule has been held to be particularly applicable to conspiracy cases. *United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir.1985), *cert. denied sub nom. Hernandez v. United States*, 474 U.S. 905 [106 S.Ct. 274, 88 L.Ed.2d 235] (1985) and *Portal v. United States*, 482 U.S. 908 [107 S.Ct. 2489, 96 L.Ed.2d 380] (1987)." *U.S. v. Castillo-Valencia*, 917 F.2d 494, 498 (11th Cir.1990), *cert. denied sub nom. Pulido-Gomez v. United States*, — U.S. —, 111 S.Ct. 1321, 113 L.Ed.2d 253 (1991). We review a district court's denial of a motion for severance under the abuse of discretion standard, *Castillo-Valencia*, 917 F.2d at 498, and are reluctant to second guess a district court's decision to deny such a motion.

*U.S. v. Gonzalez*, 804 F.2d 691, 694 (11th Cir.1986). To establish that the district court abused its discretion in denying severance, a defendant must show that without severance "he suffered compelling prejudice against which the trial court could offer no protection." *United States v. Magdaniel-Mora*, 746 F.2d 715, 718 (11th Cir.1984); *see also United States v. Morales*, 868 F.2d 1562, 1571 (11th Cir.1989). "The test for assessing compelling prejudice is whether it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against each defendant solely on that defendant's own acts, statements, and conduct, and, if possible, severance should not be granted." *United States v. Silien*, 825 F.2d 320, 323 (11th Cir.1987). If the possible prejudice may be cured by a cautionary instruction, severance is not required. *United States v. Barnette*, 800 F.2d 1558, 1570 (11th Cir.1986), *cert. denied*, 480 U.S. 935, 107 S.Ct. 1578, 94 L.Ed.2d 769 (1987).

 Skubal and Jacoby were indicted jointly. The indictment charged a single conspiracy and various substantive offenses that were interrelated aspects of the scheme to conceal Sunrise's financial problems. The evidence showed that Skubal had a significant role in the conspiracy and was involved in several of the substantive transactions, for which he was convicted. The evidence against Skubal was introduced throughout the trial. *Cf. United States v. Castro*, 829 F.2d 1038, 1046 (11th Cir.1987) (joinder improper where one month elapsed between commencement of trial and appearance of first relevant witness against Castro). At Skubal's request, the district court gave limiting instructions that the jury was not to consider certain evidence against Skubal "in any way or for any purpose."

The jury had no problem in following the court's instructions and in separately evaluating the evidence against each defendant. Although it convicted Jacoby of fifteen of the eighteen counts in which he was charged, it convicted Skubal of only five of sixteen counts. *See United States v. Caporale*, 806 F.2d 1487, 1501 (11th Cir.1986),

*cert. denied,* 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987) and *cert. denied sub nom. Gopman v. United States,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). The district court's denial of severance did not result in any "compelling prejudice" to Skubal, and the court did not abuse its discretion in so ruling.

## VI

### Sufficiency of the Evidence to Sustain Skubal's Conviction

Skubal further contends that the evidence was insufficient to prove that he knowingly and intentionally misapplied bank funds or conspired to do so. His principle contention is that he was simply a mid-level manager at Sunrise with no policy-making authority, a technician with regulatory experience who followed his superiors' instructions, but did not have any criminal intent.

Viewing the evidence in the light most favorable to the government, *United States v. Blanco,* 920 F.2d 844, 845 (11th Cir.1991), it is sufficient to sustain Skubal's convictions.

■ Three misapplication counts on which Skubal was convicted involved the three $500,000 Powell loans. Skubal attended the meeting at which Jacoby decided to make those loans, which enabled Frederick to pay off his overdrafts. After Jacoby directed Skubal to work out the details of the loans and to "get it done," Skubal prepared the sets of loan documents for Powell, Valosin, and Wood, including commitment letters which he signed, knowing them to be false. These loans circumvented the supervisory agreement and concealed the facts about Frederick's overdrafts from the Sunrise board of directors. The evidence supports the jury's conclusion that Skubal knowingly participated in a deceptive or fraudulent transaction when he executed these "sham" loans. *United States v. Stefan,* 784 F.2d 1093, 1096–97 (11th Cir.), *cert. denied* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 706 and *cert. denied sub nom. Freedman v. United States,* 479 U.S. 855, 107 S.Ct. 193, 93 L.Ed.2d 125 (1986).

■ The evidence also supports Skubal's conviction on the one misapplication count involving Skubal's approval of more than $4 million in overdrafts on Frederick and Moye's Sunrise accounts. Frederick testified that Skubal or Frame approved all of the overdrafts on his accounts, and another witness testified that these approvals occurred on almost a daily basis. A Sunrise branch manager received her instructions regarding Frederick's accounts primarily from Skubal. The evidence further showed that the approval of overdrafts was another means for making funds available to Frederick and Moye in excess of the loans-to-one-borrower limitation, that Sunrise's management endeavored to conceal the overdrafts from regulators and from Sunrise's board, and that Skubal participated in that effort. The Sunrise board was never informed of the overdrafts, which only it could approve, Skubal, experienced in banking regulatory matters (he was a former federal bank examiner), never disclosed the $4,000,000 in overdrafts (which should have been reported as unsecured loans) to state and federal regulators, even though such information was specifically requested.

■ The evidence was sufficient to support the jury's conclusion that Skubal joined in the conspiracy to misapply bank funds. He actively participated in approving the overdrafts and in the loan manipulations designed to remove the overdrafts from Sunrise's books. Together with Frame, he approved the overdrafts. He was present at the meeting at which the loans were planned, and he subsequently prepared the false documents to support those loans. This evidence allowed the jury to find that Skubal knowingly was part of an agreement to participate in an illegal venture, and is sufficient to sustain the conspiracy conviction. *United States v. Garate–Vergara,* 942 F.2d 1543, 1547 (11th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1212, 117 L.Ed.2d 451 (1991).

Contrary to Skubal's contention, the jury's acquittal of him on a number of

# 1544

substantive counts cannot be viewed as an affirmative jury determination that he did not commit those offenses. All the jury necessarily determined was that the government had not proved beyond a reasonable doubt that he had committed the crimes. Despite the acquittals, the jury would consider the facts in evidence relating to those counts in determining whether Skubal was a member of the conspiracy. Moreover, once the existence of a conspiracy has been established, a lesser amount of evidence will suffice to show that a particular individual joined the conspiracy. *United States v. Orr*, 825 F.2d 1537, 1543 (11th Cir.1987).

## VII

### *The Jury Instruction on the Misapplication Statute*

■ Skubal's proposed instruction on the misapplication statute, 18 U.S.C. § 657, was that the statute required proof that the defendant knowingly and willfully acted with intent to "injure or defraud" the savings and loan association. All parties agreed to this instruction and the court gave it in the written charge. Before the jury retired to deliberate, Skubal objected to other instructions, but not to this one.

After the jury had retired, it sent a note to the judge pointing out that although his written instructions had said injure "or" defraud, the indictment charged that the defendants had acted with intent to injure "and" defraud and that the oral instruction also used "and," and requested clarification. Skubal urged the court to tell the jury that injure "and" defraud was the correct requirement and asserted that the "core" of his defense was predicated on the government's obligation to prove that he had intended both to injure and to defraud Sunrise. The court refused the jury's request for clarification, ruling that the written instruction was correct. Skubal contends that the district court erred in refusing to accept his position, and that the effect of the court's adoption of the injure "or" defraud charge was impermissibly to broaden, and therefore to amend, the indictment.

The law in this circuit, upon which the district court relied in its instruction, is that, under § 657, "the accused must have acted with an intent to injure or defraud the bank." *United States v. Payne*, 750 F.2d 844, 855 (11th Cir.1985). The instruction was a correct statement of the law, was requested by all parties, and was not objected to until after the jury had retired for its deliberations and discovered the discrepancy between the indictment and the written instruction. The district court did not err in refusing to give the jury the conjunctive instruction.

■ Having himself requested the instruction, Skubal is in no position now to complain that the court gave it—particularly since he did not object after it was given. *Cf.* Fed.R.Crim.P. 30 ("No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict...."). If the requirement that the government must prove intent to injure and defraud was indeed the "core" of Skubal's defense, it is curious that he proposed an instruction incorporating the injure or defraud standard and did not raise the point until the jury was deliberating and asked for clarification. Moreover, in view of Skubal's initial support of and acquiescence in the "or" instruction when it was given, his present claim that the instruction constituted an impermissible broadening of the indictment rings hollow.

■ Skubal also contends that the district court should have defined "intent to injure" for the jury, as he requested. The court was not required to do so. *See United States v. Anderton*, 629 F.2d 1044, 1048–49 (5th Cir.1980) ("terms which are reasonably within the common understanding of juries, and which are not technical or ambiguous, need not be defined in the trial court's charge").

## CONCLUSION

The convictions of Robert C. Jacoby and Thomas Skubal are AFFIRMED.