United States Court of Appeals,

Eleventh Circuit.

No. 96-4225.

UNITED STATES of America, Plaintiff-Appellee,

v.

Dana SCHEER, Defendant-Appellant.

Feb. 25, 1999.

Appeal from the United States District Court for the Southern District of Florida. (No. 87-6034-CR-HOEVELER), William M. Hoeveler, Judge.

Before EDMONDSON and BIRCH, Circuit Judges, and LAWSON[*], District Judge.

BIRCH, Circuit Judge:

Dana Scheer appeals his convictions for misapplication of bank funds, 18 U.S.C. §§ 2 and 657, and making false statements for the purpose of influencing a financial institution, 18 U.S.C. §§ 1014 and 2. Scheer's trial and convictions arise from his participation in a series of transactions that culminated in the insolvency of the Sunrise Savings and Loan Association. In this appeal, Scheer raises numerous issues concerning the fairness of his trial, several of which relate to alleged prosecutorial misconduct. Having reviewed the record with respect to each of these claims, we conclude that Scheer's claim regarding prosecutorial intimidation of a witness sufficiently undermines our confidence in the integrity of Scheer's trial and in the verdict to warrant reversal of Scheer's convictions and, therefore, remand this case for a new trial.[1]

---

[*]Honorable Hugh Lawson, U.S. District Judge for the Middle District of Georgia, sitting by designation.

[1]Because we set aside Scheer's convictions based on this single issue, we decline to address the other enumerations of error that Scheer raises on appeal.

# I. BACKGROUND

The facts surrounding the formation and eventual failure of Sunrise Savings and Loan Association ("Sunrise") have been detailed extensively in several of our prior opinions, *see, e.g., United States v. Foxman,* 87 F.3d 1220 (11th Cir.1996) and *United States v. Jacoby,* 955 F.2d 1527 (11th Cir.1992). We briefly summarize the facts and allegations relevant solely to the charges against Scheer and the specific issues raised in this appeal: In 1984, the year in which most of the events pertinent to this action transpired, Scheer worked as an associate at the law firm of Blank, Rome, Comiskey, and McCauley ("Blank, Rome"). Scheer's immediate supervisor at that time was Kenneth Treadwell, a partner at Blank, Rome. Among his duties as an attorney, Scheer routinely handled real estate closings on behalf of Sunrise, which had been founded by another Blank, Rome partner, Michael Foxman. In 1984, Robert Jacoby was the president and chairman of the board of directors at Sunrise. Early in that same year, Sunrise's board of directors entered into a supervisory agreement with the Federal Savings and Loan Insurance Corporation (FSLIC) and the Florida Comptroller's Office pursuant to which, *inter alia,* all future Sunrise loans exceeding a specified amount would require board approval and "specific supporting documentation demonstrating compliance with underwriting and credit requirements." *Jacoby,* 955 F.2d at 1531.

William Frederick and Thomas Moye were co-owners of Commercial Center Development Corporation, a real estate company that developed commercial properties. Frederick and Moye began borrowing money from Sunrise in 1980 and, over the course of the next five years, Sunrise became their exclusive lending institution. By 1983, Frederick and Moye had fallen behind substantially on the interest payments on their loans but, to maintain the appearance that the accounts were current, obtained additional loans through overdrafts, or unsecured lines of credit, that

2

were approved by individuals within Sunrise. By the summer of 1984, Sunrise had loaned Frederick, Moye, and their business concerns over $150 million. At the same time, Sunrise's outside auditors discovered that Frederick and Moye's personal accounts collectively were overdrawn by more than $4 million. As a result, the auditors advised Jacoby that, unless the overdrafts were satisfied by August 30th, the auditors would not certify Sunrise's financial statements for that fiscal year. R34 at 2911. According to testimony adduced at trial, Jacoby, Frederick, and several other individuals associated with Sunrise[2] discussed various options for eliminating the Frederick and Moye overdrafts. *See* R34 at 2913. The participants at the meeting agreed that Sunrise would extend loans in the amount of $500,000[3] to various personal acquaintances or relatives of those attending the meeting; these borrowers would use the funds to purchase property from Frederick and Moye, who would in turn use those proceeds to cover the overdrafts in their accounts with Sunrise. The borrowers chosen for these transactions were Charles Powell, an associate of Ron Berkovitz at Alpha Capital Group; Virginia Valosin, Frederick's cousin and employee; and Meryl Wood, Frederick's yacht broker. According to the testimony of Taber, at the conclusion of the meeting Jacoby requested that those present "get it done." *Id.* at 2918. It is undisputed that on August 30th and 31st, Sunrise extended lines of credit for real estate, guaranteed by Frederick, to

---

[2]Trial testimony from several witnesses consistently showed the following individuals to have been present at this meeting: Jacoby; Frederick; William Frame, Sunrise's executive vice-president for lending operations and a co-defendant at Scheer's trial; Joseph Taber, also a Sunrise executive vice-president; Thomas Skubal, a Sunrise Mortgage Corporation vice-president; and Ron Berkovitz, a representative from Alpha Capital Group, which arranged financing for developers. *See e.g.,* R39 at 3579; R34 at 2912.

[3]According to the government's theory of the case at trial, setting the amount of the loans at $500,000.00 or less enabled the various individuals who implemented this plan to circumvent both the documentation required by the supervisory agreement and the requirement that the loan be approved by Sunrise's board of directors.

3

Meryl Wood, Charles Powell, and Virginia Valosin, and that Scheer acted as the closing attorney for these transactions ("the August 30th transactions"). It was the government's contention at trial that the loans to each of these individuals constituted sham transactions, whereby Powell, Wood, and Valosin acted as nominee borrowers to enable Sunrise to extend further credit (that Sunrise would otherwise be precluded from extending by virtue of the supervisory agreement) to Frederick and Moye.

In addition, the government introduced evidence at trial demonstrating that, subsequent to the August 30th transactions, Sunrise purchased from Frederick and Moye a property, referred to by the parties as "Seawalk," for $13.5 million. *See e.g.,* R34 at 2957. The government argued at trial that Sunrise purchased Seawalk for more than its fair market value; that this constituted another attempt to cover the increasingly delinquent interest payments accruing in Frederick's and Moye's accounts with Sunrise; and that Scheer facilitated this scheme by acting as closing attorney on the real estate purchase.

The government indicted and prosecuted Scheer for thirteen counts of conspiracy to misapply bank funds, misapplication of bank funds, and aiding and abetting the making of false statements on a loan application in relation to both the August 30th and Seawalk transactions. R1 at 436. After a lengthy trial, the jury convicted Scheer of conspiracy to misapply bank funds, as well as two counts of misapplication of bank funds and two counts of aiding the making of false statements in connection with the extension of credit to Wood and Valosin on August 30th, 1984; the jury acquitted Scheer of all counts related to the Seawalk purchase.

In a post-trial order, the district court set aside the conspiracy conviction with respect to Scheer (as well as his two co-defendants) after finding a variance in the indictment and the proof

4

adduced at trial that substantially prejudiced the defendants. Specifically, the court determined that the indictment alleged that part of the conspiracy count involved another savings and loan institution, referred to by the parties as "Crusader," in which these defendants unambiguously never participated and which occurred prior to their tenure with Sunrise; that the prosecutor argued his intention to "link up" the evidence but, in fact, never showed any relationship between the events surrounding Crusader and the evidence that arguably implicated these defendants; and that the prosecutor made repeated reference to Crusader in his opening and closing statements and in questions to witnesses, notwithstanding the fact that—as found by the district court—there was no connection between Crusader and any of the allegations regarding Scheer or his co-defendants.

In its order, the district court further remarked upon multiple instances of prosecutorial overzealousness and excess, *see e.g.,* R4—817 at 37 ("Apparently, one of the prosecution's motivations for introducing Crusader evidence was to prejudice these defendants by tainting them with crimes in which they played no role."); *id.* at 42 ("The enthusiasm and aggressiveness with which the prosecution pursued this case ... ultimately led to excesses, some, but certainly not all, of which have been outlined."); *id.* at 28 ("The vigor and enthusiasm which powers the successful prosecution of those guilty of criminal conduct is commendable and should be encouraged. We must never, however, sanction the excesses which result form [sic] unchecked enthusiasm—excesses which lead to justifications of the type presented [by the prosecution] here."). The court, however, found the evidence sufficient to sustain the remaining convictions against Scheer for misapplication and false statements in connection with the August 30th loans to Wood and Valosin.

Prominent among the instances of possible prosecutorial overreaching described by the district court in its post-trial memorandum, the court noted that, during the trial, the lead prosecutor

5

apparently issued a verbal threat to a critical witness, Robert Jacoby, who testified on behalf of the government. The district court held a hearing on the allegation and decided that, although the incident did "appear[ ] to be an instance of prosecutorial intimidation of a witness," *id.* at 45, the defendants had not shown that Jacoby had changed his testimony as a result of the threat. Finding no connection between the prosecutor's threat and Jacoby's testimony, the court let the convictions stand. Although we note that the district court's handling of this unwieldy and contentious trial from start to finish was often exemplary, the following discussion outlines our basis of disagreement with the court's disposition of this particular issue.

## II. DISCUSSION

Scheer presents his claim of prosecutorial misconduct under the rubric of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Scheer argues that, in withholding information regarding the prosecutor's threatening remarks to a key prosecution witness, the government failed to divulge material impeachment evidence that was, in essence, exculpatory by virtue of its ability to cast substantial doubt on the credibility of the witness. The facts and allegations underlying this contention are described briefly below.

A. *The Conversation Between Jacoby and Genge*

Jacoby was on probation when he testified at Scheer's trial and at the post-trial evidentiary hearing. At the hearing, Jacoby testified that, during the week end that intervened between the first and second day of his testimony, he met with Assistant United States Attorney Genge and another member of the prosecution team, David Batlle, to go over his testimony. Jacoby testified that, during that conversation,

> [Mr. Genge] at some point kind of turns to me and says—he has a funny way of
> pointing—kind of points at me and says, "Now, I know you are going to come through for

6

us or for me. I know you are going to come through on that, and if you don't come through on that, Tony[4] is going to put the cuffs on you and you are going to be out of there in 45 seconds."

He kind of rocks back and smiles. He may have done it twice, rocked back and smiles. I turned to David. I looked at Dave, kind of like, "What is that?" Dave looked at me. He didn't smile. He just kind of looked sheepishly away, and then we went on.

R64 at 81. Jacoby suggested that he inferred from these remarks that Genge was directing him to state in his testimony that Jacoby had defrauded Sunrise, *see id.* at 121, a position that Jacoby had not taken at his own trial. Jacoby offered conflicting testimony as to whether he had regarded Genge's comments as a threat that had real possible consequences. Jacoby testified that he had related this entire event to Frame and Thomas Skubal, a defendant in an earlier criminal proceeding involving Sunrise. Jacoby suggested, however, that he may have exaggerated his description of his own response to Genge's remarks to "mollify, placate, or in other words, otherwise deal with Mr. Skubal ... [who] is a lot more emotionally involved in this case." *Id.* at 83. Later in his testimony, Jacoby stated that he "embellished" the importance of the event in order to "help" Frame prepare for a conviction in this case. *See id.* at 140-42. In response to yet another round of questioning about Jacoby's perception of Genge's remarks, Jacoby testified that "I still don't think it was a joking matter in the sense that it is somebody in my spot wouldn't take it necessarily as a joke." *Id.* at 138-39. Jacoby also offered the following observations regarding the effect of Genge's comments on his trial testimony:

I wasn't—what is the word? I wasn't influenced by it. It did not make me change my testimony. I didn't lie because of it. I didn't do anything because of it, but it did upset me, and I would use a different word if I wasn't in the court. I thought it was insensitive, but again that is probably irrelevant.

---

[4]Genge's reference to "Tony" referred to an agent of the Federal Bureau of Investigation, Tony Yanketis. *See* R64 at 27.

*Id.* at 83.

Jacoby acknowledged in his testimony that, although the relevant conversation with Genge took place in October, at the same time he was giving testimony in the case, it is likely that he did not tell Frame about it until the jury deliberations began in January. *See id.* at 109. Jacoby also agreed that he had refused to speak to any of the defendants' lawyers prior to the evidentiary hearing and, similarly, had refused to speak to the Justice Department regarding its earlier investigation of Genge. *See id.* at 94-98.

Thomas Skubal, one of Jacoby's former Sunrise associates, also testified at the evidentiary hearing. Skubal stated that he had met with Frame and Jacoby at a bar to discuss business[5] sometime during or after the trial. Skubal offered the following account of what transpired during that meeting:

> A: Well, [Jacoby] had told Frame and myself that Mr. Genge pulled him aside after one of his days of testimony, and told him that if he didn't start cooperating, shaking his finger at Jacoby, that he would have the FBI Agent Yanketis take him back to Eglin, or take him back to prison. I am sorry.

R64 at 27. Skubal testified that Jacoby recounted that Genge intended for Jacoby to be taken "[o]ff the stand" and back to prison if Jacoby did not "start cooperating." *Id.* Skubal further testified that Jacoby had interpreted the prosecutor's comment as a directive to testify that Jacoby had knowingly and intentionally defrauded the directors of Sunrise and government officials. *Id.* at 29. Skubal also noted that, in a subsequent conversation held closer to the time of the hearing, Jacoby told him that

---

[5]At time of the hearing, Skubal operated a pool hall located in a shopping center that Jacoby managed.

"in Mr. Genge's mind he may have been joking, but there is no way that he [Jacoby] took it as a joke." *Id.* at 35.[6]

Frame's lawyer, with whom Jacoby spoke briefly about the incident, testified that Jacoby had told him that "any reasonable person would conclude that what Mr. Genge had said to him was a threat." *Id.* at 69-70. He also stated that Jacoby had indicated that he would not provide an affidavit describing the incident until the trial was over. *Id.* at 70.

Scheer argues that Genge's remarks constituted critical impeachment evidence that the government, by concealing this incident, withheld from Scheer at the time of the trial. The potentially exculpatory nature of these remarks derives from the possibility that Jacoby may have felt compelled to fully implicate himself, as president of Sunrise, in the knowing, intentional defrauding of the bank at the risk of having his probation revoked. The import of such a "confession" would be to fully implicate the defendant-lawyers, who were admittedly involved in the day-to-day operations of the bank, as equally knowing participants in Jacoby's plan to commit bank fraud. Had Scheer been able to bring out in his cross-examination of Jacoby the fact that Jacoby had been intimidated by the assistant U.S. attorney prosecuting this case, the value of Jacoby's testimony would have been considerably diminished.

The government contends on appeal, as it did at the evidentiary hearing, that Scheer (and his co-defendants) waived this claim by failing to raise it immediately when they learned of the alleged threats to Jacoby. The district court held its evidentiary hearing regarding the allegation of prosecutorial intimidation of Jacoby several months after the trial had concluded. At that hearing,

---

[6]In addition, Skubal testified that, while in prison together, he and Jacoby had coined an expression, "the wrath of Genge," to refer to the fact that "if we did not cooperate with Mr. Genge, we did not know what was going to happen to us." *Id.* at 32.

the defendants' lawyers indicated to the judge that, during the third week of jury deliberations, Jacoby had advised one of the defendants, William Frame, that he had been threatened by one of the assistant United States attorneys, Lothar Genge, who was prosecuting the case. Jacoby subsequently spoke to Frame's lawyer, who notified the attorneys for Scheer and the remaining co-defendant, Kenneth Treadwell. Immediately following the trial, a representative from the law firm of Treadwell's lawyer asked the Office of Professional Responsibility ("OPR"), a division of the United States Department of Justice, to investigate the allegation. OPR referred the matter to the Justice Department's Office of Public Integrity to conduct a criminal investigation, but the Justice Department declined to press criminal charges against the prosecutor. Before this investigation had been completed, however, the defendants had filed with the district court a motion for a new trial based on these same allegations.

Although we are cognizant both of the duty of a defendant to bring to the trial court's attention any perceived violations or objections that potentially undermine the integrity of the process and the concomitant probability that the defendant's failure to voice these challenges in a timely fashion may result in waiver, *see Watkins v. Bowden,* 105 F.3d 1344, 1352 n. 16 (11th Cir.1997), we conclude that the facts of this case militate against the formulaic application of this well-established procedural principle. As noted by Scheer's trial counsel at the court's hearing, Jacoby's communication to one of Scheer's co-defendant placed the defendants in a peculiarly difficult dilemma: On the one hand, they faced the prospect that, by failing to raise this allegation, they might waive the issue altogether. On the other hand, they also knew that (1) neither Jacoby nor the prosecutor who allegedly issued the threat would talk to defense counsel during the trial and, as a result, there was no way to corroborate the allegation; (2) Jacoby may have remained genuinely

10

fearful that the prosecutor would revoke his probation if he testified at an evidentiary hearing regarding this threat; and (3) this entire trial had been characterized by a considerable rancor between defense counsel and the lead prosecutor, thereby rendering potentially suspect any serious allegations of prosecutorial misconduct that lacked substantiation or corroboration. *See* R64 at 15-16. Bearing these particular facts in mind, it was reasonable for defense counsel to attempt, in the first instance, to bring the entire matter to the Justice Department in the hopes of obtaining truthful testimony from Jacoby without fear of retaliation or repercussion from the same prosecutor who had issued the threat.

B. *The Legal Principles Governing this Case*

We determine, at the outset, that some version of the comments by the assistant U.S. attorney, as described in various accounts at the evidentiary hearing, actually occurred. Genge, the assistant U.S. attorney who allegedly made the remarks, was present at the evidentiary hearing but did not testify. The government has never argued that the incident did not occur. The district court, for purposes of its post-trial order, assumed that the conversation did take place and, after hearing Jacoby's testimony at the evidentiary hearing, noted that "[t]he Court has little doubt that Jacoby construed the prosecutor's statement as a threat." R4-817 at 45. Although we acknowledge that there are slightly different versions of what Genge said to Jacoby on this particular occasion, the fact that this assistant U.S. attorney made a remark to Jacoby that reasonably could be construed as an implicit—if not an explicit—threat regarding the nature of Jacoby's upcoming testimony remains uncontroverted.

As previously noted by both our court and the Supreme Court "regardless of request, favorable, exculpatory or impeachment evidence is material, and constitutional error results from

11

its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Noriega,* 117 F.3d 1206, 1218 (11th Cir.1997) (quoting *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995)) (internal markings and quotation marks omitted). A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566 (quotation marks and citation omitted). In the case of impeachment evidence, a constitutional error may derive from the government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination. *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985). In rejecting any distinction between impeachment evidence and exculpatory evidence in the *Brady* context, the Supreme Court has observed that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

In *Hays v. Alabama,* 85 F.3d 1492 (11th Cir.1996), we explicitly set forth the factors, as established by the Supreme Court in *Kyles,* that necessarily must guide our determination as to the materiality of evidence: First, " "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,' " *id.* at 1498 (quoting *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566). "Thus, undisclosed evidence can require a new trial even if it is more likely than not that a jury seeing the new evidence would still convict." *Id.* Second, "a defendant need not show there was insufficient

12

evidence to convict in view of the suppressed evidence." *Id.* Third, "there is no harmless error review of *Bagley* errors." *Id.* Fourth, "materiality is to be determined collectively, not item-by-item." *Id.* (internal citation and quotation marks omitted). We review *de novo* the district court's determination as to whether a reasonable probability exists that the suppressed evidence would have change the outcome. *Id.*

We conclude that the district court did not properly apply either the "materiality" or "reasonable probability" analysis established by the Supreme Court in *Kyles.* The district court found, for instance, that because Jacoby testified that he was upset but not influenced by Genge's remarks, "[t]he necessary connection between the prosecutor's threats and Jacoby's testimony, therefore, appears to be absent." R4-817 at 45. The court further observed that, even if Jacoby had altered his testimony in response to a perceived act of intimidation, "other evidence against Scheer ... was sufficiently compelling to convict [him]." *Id.* Under both *Kyles* and *Hays,* however, Scheer need not prove that Jacoby *in fact* changed his testimony. Scheer also is not required to show that, had the government not suppressed this evidence, other evidence in the case standing alone would have been insufficient to convict. The relevant inquiry, rather, is whether the suppression of this information undermines our confidence in the trial. *See Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566.

Although an evaluation of whether there is a reasonable probability of a different result may necessitate an examination of the other evidence presented at trial, the Supreme Court expressly has disavowed a simple "sufficiency of the evidence" test in the *Brady /Bagley* context:

> The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

13

*See Kyles,* 514 U.S. at 435, 115 S.Ct. at 1566. (footnote omitted).

Having reviewed the extensive record in this case with respect to both the trial and the evidentiary hearing held to explore the relevant *Brady* violation, we conclude not only that Genge's threatening remark to Jacoby constituted material impeachment evidence but, moreover, that disclosure of this evidence to Scheer's counsel would have made a different result reasonably probable. Our conclusion is informed by the importance and specificity of Jacoby's testimony, particularly when compared with that of other prosecution witnesses.

C. *Why the Prosecutor's Undisclosed Remarks are Material and Exculpatory*

Jacoby's testimony was critically important to the government's case. At trial, Jacoby testified that he had discussed with Scheer the existence of the Frederick overdrafts, *see* R. Supp. 5 at 1198; that Scheer had attended meetings at Sunrise at which possible solutions to the overdrafts were discussed, *see id.* at 1276; and that Scheer had given Jacoby advice regarding federal regulations governing the amount of credit a bank could extend to a single borrower (the "loan-to-one" regulations)[7], *see* R. Supp. 8 at 1907. Jacoby also testified that Joe Taber, a Sunrise executive, had told Jacoby that Scheer had "chosen the individuals" later allegedly used by Sunrise as nominee borrowers in the August 30th transactions.[8] R. Supp. 5 at 1284. The government also

_____

[7]In response to cross-examination revealing that Jacoby had testified at his own criminal trial that he probably didn't consult Scheer "much" about loans-to-one borrower regulations, Jacoby subsequently stated that "I didn't say I spoke much to him. I said I spoke to him about it, yes." R. Supp. 8 at 1907.

[8]Interestingly, Taber did not corroborate this assertion in his own testimony at Scheer's trial. In his direct testimony, Taber stated that he had spoken to Scheer on the telephone regarding the August 30th transactions. According to Taber, Scheer had told him in that conversation that Scheer was "having a hard time securing Sunrise's mortgage interest in one of the properties that was supposed to secure one of the loans." R34 at 2924. Taber also testified extensively about a meeting held at Sunrise on August 27th, 1984, that Jacoby attended at which the plan to create

14

used Jacoby as a vehicle for introducing a memorandum written by Scheer that the government suggested, through Jacoby's testimony, constituted evidence of Scheer's efforts to conceal his involvement in the August 30th transactions. That memorandum, dated August 29, 1984, and addressed to Scheer's own file, stated, in pertinent part:

> I was requested by Rob Jacoby, in a telephone conversation on this date, (Rob Jacoby was in New York) to close each of these loans. Mr. Jacoby indicated that he had presented these loans before executive committee in evening session, August 28th, 1984, and had received their approval.
>
> Mr. Jacoby indicated that upon his return to Palm Beach, he would immediately sign and forward a memo authorizing me to close these loans, notwithstanding having no surveys, appraisals, title commitments, utility letters, permit, opinions of counsel, and notwithstanding the fact that by making several of these loans, we might be violating doing business laws in the State of Maryland and placing mortgages on parcels which were not legally able to be subdivided in the event of foreclosure.
>
> Mr. Jacoby indicated that no board approval would be necessary for any of these loans, and that it was necessary to immediately close as soon as possible.
>
> A letter to file has been dictated by me and is in Mr. Jacoby's office awaiting his return.

R. Supp. 8 at 1927-28. On direct examination, Jacoby read this memorandum aloud and, in response to the prosecutor's questions regarding each paragraph, essentially discredited the veracity of each statement in the memorandum. For example, Jacoby testified that (1) he did not recall asking Scheer to close the August 30th loans; (2) he did not believe that he had indicated to Scheer that he had received the approval of the executive committee for the loans; (3) he did not subsequently forward

---

loans to nominee borrowers for the purpose of covering Frederick's and Moye's overdrafts was discussed. On cross-examination by Scheer's counsel, Taber agreed that the prospective borrowers (including Valosin, Wood, and Powell) were proposed at that meeting; that Scheer did not attend the meeting; and that Jacoby "actively participated" in the meeting. *See* R37 at 3438-39. Taber also agreed that Jacoby was present when the August 30th borrowers were chosen. Finally, in response to a direct question as to whether Taber had ever told Mr. Jacoby "that Dana Scheer picked the borrowers," Taber responded "No." *Id.* at 3440.

to Scheer a memorandum authorizing the loans; and (4) he did not receive a letter from Scheer when he returned from his trip to his office.[9] R. Supp. 5 at 1304-07.

Finally, Jacoby offered the following testimony on redirect examination:

Q: Well, Mr. Jacoby, during the period of time beginning 1983 and continuing through 1984, sir, let me just ask you this:

Did you knowingly and intentionally cause false internal reports, such as loan to one borrower reports, to be filed at Sunrise. Yes or no?

A: I participated in that, yes.

Q: And did you do that knowingly and intentionally?

A: I was conscious of it, yes.

Q: Did you take those actions, sir, with intent to defraud Sunrise?

A: Some of the actions I took I knew I was doing something that was not to the benefit of Sunrise.

Q: Did you know it was wrong?

A: I knew some of it was wrong, yes.

---

[9]It is interesting to note that at Jacoby's own trial, at which Jacoby sought to shift responsibility for many of Sunrise's questionable transactions to bad (or nonexistent) legal advice from Sunrise's Blank, Rome lawyers, the government introduced the "Scheer Memorandum" as evidence that Blank, Rome had acted in good faith with respect to Sunrise; that Jacoby had not relied on his attorneys' faulty legal judgment regarding the legality of these transactions; and that the lawyers at Blank, Rome simply were executing the wishes of their client, Sunrise. Indeed, it was Jacoby who sought unsuccessfully to exclude the Scheer Memorandum from evidence at his trial, and the government that prevailed in introducing the memorandum to demonstrate the law firm's lack of culpability. Through Jacoby's testimony at *Scheer's* trial, however, the government sought to demonstrate that, in composing this memorandum, Scheer had attempted to "cover" his participation in the August 30th transactions by making it appear that, notwithstanding Scheer's legal advice to the contrary, Jacoby had requested that he close the relevant loans.

R. Supp. 10 at 2386. Jacoby further testified that he consciously acted to misapply funds in connection with the August 30th loan closings; that he intentionally misapplied funds in connection with the Seawalk purchase. *See id.* at 2387-88. Jacoby noted that Scheer was "involved" in these wrongful acts, "[m]ore so as to the August 30th. I am not certain at all as to Seawalk." *Id.* at 2388.

Although we do not apply a "sufficiency of the evidence" test to the testimony of other witnesses at Scheer's trial, we do note that the importance of Jacoby's testimony—and his credibility in relation to that testimony—cannot be evaluated in isolation from the less conclusive testimony offered by other witnesses. Several of the individuals who borrowed money from Sunrise in relation to the August 30th transactions, denominated by the government as "nominee borrowers," testified at Scheer's trial. Virginia Valosin, for instance, testified that, on August 31st, 1984, she signed a series of documents at the office of Commercial Development Corporation[10] that effectively granted to her a line of credit of $500,000.00. Valosin further stated that, at the time she signed these papers, her net worth was approximately $1,000.00; that she had never actually applied for the loan she received, nor provided any financial documentation to support the loan; and that she signed a document stating that she, as the applicant of the loan, was not acting as an agent or nominee on behalf of another person, although she knew that this statement was false. On cross-examination, however, Valosin indicated that she may not have read most of the documents she signed and that she assumed the transactions were valid because she trusted Frederick. *See* R40 at 3918. In

---

[10]Valosin had gone to the office of Blank, Rome with Moye's sister, Sandy, on the previous day, August 30th, at Frederick's direction, presumably to execute these same documents. After arriving at the Blank, Rome offices, however, Moye and Treadwell had a heated argument that caused Moye to inform Valosin that they would have to leave. By the next day, Moye apparently had changed his mind about Valosin signing the documents necessary to close the loan. *See* R40 at 3872-74.

response to Scheer's inquiry as to whether Valosin believed that she was actually purchasing property, identified as the "Greentree parcel," Valosin stated that she was familiar with the property in question;  that she understood that she "was borrowing $500,000.00 that would have been guaranteed by a portion of property that they were transferring to [Valosin's] name," *id.* at 3920; that she knew that Frederick had guaranteed the loan;  and that Frederick's guarantee of the loan made her "more secure" in signing the documents. *Id.* at 3920-22.  During Valosin's testimony, the government placed into evidence the closing papers on Valosin's loan indicating that Scheer was the closing attorney and had witnessed Frederick's signature as guarantor on the loan.  Valosin testified that she had no actual communication or contact with Scheer regarding the loan documents she had signed. *Id.* at 3920.

Wood testified that, on August 30th, 1984, he met in a Blank, Rome conference room with Scheer and Frederick to execute what he believed to be a valid real estate transaction involving the extension of credit to Wood for approximately $305,000.00.  Wood testified that Scheer and Frederick instructed him to sign or initial a stack of documents;  that he attempted to read the documents but was instructed by Scheer, jokingly, to "sign.  Don't read."  R39 at 3656-57.  Wood also testified that, in response to his request that he receive copies of the documents he had signed, Scheer laughed. *See id.*  Wood stated that, at the time he signed these loan documents, Scheer knew that Wood was Frederick's yacht broker. *Id.* at 3658-59.

Powell's account of his August 30th meeting with Scheer differed sharply from that offered by Wood.  Powell, a real estate broker, testified that at the time he purchased the Frederick properties, he understood that Frederick would be liable for the interest on the loan in exchange for Powell giving him the option to purchase back the property. *See* R48 at 6011.  Powell further noted

18

that, based on his experience at numerous real estate closings, this particular closing was not unusual; that Scheer and Treadwell had suggested that Powell read the documents he was signing; and that Powell did read the documents and found them to be satisfactory. *Id.* at 6017-18. Powell also stated that, at the time of the closing, he believed that he was receiving free and clear title to the properties he had purchased. *See* R49 at 6363.

Lucy Holton, a Blank, Rome real estate paralegal, testified that she had worked closely with Scheer on many real estate transactions. Holton stated that she had been present during the real estate closing with Wood but did not elaborate as to her specific recollection of that meeting. Holton agreed when asked, however, that Scheer customarily "explain[ed] to borrowers who were asking questions, to answer their questions about the details of their loans ... [and to] give copies to borrowers of their loan documents." R33 at 2663-64. During Holton's testimony, the government introduced two series of checks pertaining to the August 30th transactions that bore Scheer's signatures; the first set contained the description "Frederick Workout" and the name of the borrower in the check legend, but this identification, along with Scheer's signature, had been removed. The second series of checks identified in the same space the name of the borrower and the purchased properties. *See id.* at 2599. The government also introduced carbon copies of these checks, in which information in the memorandum section had been crossed out. *See id.* at 2607. These carbons did not contain Scheer's signature. In response to Scheer's questions regarding the duplicate set of checks, Holton testified that she had ordered new checks from Blank, Rome's bookkeeping department with respect to the August 30th transactions to reflect the proper names of the borrowers;

19

that nobody had told her to obliterate information on the checks; and that Scheer had never told her to conceal any information regarding these closings. *Id.* at 2658-60.[11]

It is clear that the government presented some testimony that implicated Scheer in the relevant Sunrise transactions. This testimony, however, was neither uniform nor overwhelming in showing that Scheer knowingly misapplied funds; more importantly, it was not cumulative in relation to Jacoby's testimony. Jacoby was central to the government's case precisely because he was an "insider" with respect to each and every aspect of this case. In theory, Jacoby, as president of Sunrise, was uniquely positioned to know the precise involvement of each banker or lawyer in each transaction alluded to by the government. Moreover, by acknowledging on redirect full culpability for his conduct at Sunrise (though reluctantly, to be sure), Jacoby effectively undermined Scheer's effort to distance himself from any intentional scheme to misapply funds or to argue that he was unaware that the loans he had closed were illegitimate. Finally, Jacoby's testimony discrediting Scheer's memorandum to Jacoby potentially invalidated a piece of evidence that would have been critical in showing that Jacoby had requested Scheer to close the August 30th loans notwithstanding Scheer's advice to the contrary.

In short, Jacoby was a crucial prosecution witness. Again, we do not imply that he was the *only* witness who testified against Scheer, nor do we suggest that there was not other compelling testimony that could support Scheer's conviction. Rather, it is because of the relative importance of Jacoby's testimony that we view his credibility to the jurors as so fundamental to Scheer's convictions. *See Kyles,* 514 U.S. at 436, 115 S.Ct. at 1569 (where Court determined that

---

[11]Although many other witnesses testified at the trial of Scheer and his two co-defendants, we have excerpted or summarized portions of the trial transcript containing testimony described by both Scheer and the government as highly relevant (and, in some cases, damaging) to Scheer.

government's non-disclosure of exculpatory statements by eyewitnesses undermined confidence in verdict, Court observed that "[d]isclosure of [these] statements would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense."). It is worth observing that the government chose to begin and end its summation with a pointed recapitulation of Jacoby's testimony. Toward the beginning of his closing statement, Genge discussed in depth the reasons why the jury should credit Jacoby's testimony and, shortly thereafter, read extensive quotations from Jacoby's testimony directly implicating Scheer. *See* R57 at 7777-80. Genge concluded his summation by reading, again, directly from Jacoby's testimony, quoted earlier here, in which Jacoby stated not only that he had acted with intent to defraud Sunrise but, moreover, that he had done so with the "involvement" of Scheer and his co-defendants. *See id.* at 7878-79. Finally, after completing his reading of relevant portions of Jacoby's testimony, Genge stated:

> That was Mr. Jacoby. You heard him. You saw him. It is for you to judge his testimony and to evaluate it in light of everything else you have heard in this case. Was he, is he, did he lie before you? He is trying to pull the wool over your eyes, or somebody else?
>
> I respectfully submit to you and I leave you with this final thought. In assessing Mr. Jacoby's testimony, assess his by the same standards that you are going to apply to Mr. Powell's testimony, and if you do that in all respects, I am confidant that you will return a true and just verdict in this case and we cannot ask for anything more. Thank you very much.

*Id.* at 7879.

It is thus reasonable to infer that the government, too, viewed both the content of Jacoby's testimony and his credibility before the jury as vital for obtaining convictions against the defendants.

21

At the close of a trial that lasted more than three months and involved numerous witnesses, it was of Jacoby's testimony that the prosecutor sought to remind the jury as deliberations began.[12]

For the sake of clarity, we observe, again, that Genge's intimidating remarks to Jacoby were potentially exculpatory in nature because knowledge of this incident would have allowed Scheer powerfully to impeach the credibility of Jacoby—a witness whose credibility was central to the prosecutorial effort here. In fact, the extent to which the jury should credit Jacoby's testimony was a recurring theme at different points in the trial. Jacoby testified repeatedly that he had been given immunity from future prosecution if he testified truthfully at Scheer's trial, but had no other agreement with the government in exchange for testimony. Jacoby testified extensively as to false statements he had given at his own trial, *see* R. Supp. 6 at 1428-32, and conceded that Genge had referred to him as "a brazen perjuror" in a sentencing memorandum, *id.* at 1563. Jacoby testified that, although he hoped his testimony at Scheer's trial would result in a reduction in his probation, neither he nor his lawyers had, thus far, discussed this possibility with the government. *See* R. Supp. 7 at 1644-45. In the context of Jacoby's testimony before the grand jury, Jacoby also stated that, although he had an expectation that Genge would report his cooperation to the district court, he was unaware that he would not get a reduction in sentence without the government's support.[13] *See* R.

_____

[12]Indeed, it is interesting that Jacoby testified that Scheer was more involved in the August 30th loans than in the Seawalk purchase and, consistent with this characterization, the jury convicted Scheer of the August 30th transactions but acquitted him of any involvement in Seawalk. Similarly, Jacoby testified that one of Scheer's co-defendants, Treadwell, was less involved in the August 30th loans but very involved in Seawalk; the jury convicted Treadwell of the events surrounding Seawalk but acquitted him of the August 30th deals.

[13]Jacoby's assertion that he did not necessarily understand the importance of receiving government support in obtaining a reduction in sentence or probation strains credulity. Jacoby had already received a substantial reduction in his sentence after the government filed a motion under Federal Rules of Criminal Procedure 35(b), based on Jacoby's substantial cooperation. It

22

Supp. 6 at 1579. As alluded to earlier, Genge spoke for several minutes during his closing argument at Scheer's trial explicitly about Jacoby's credibility. As part of his discussion regarding Jacoby's credibility, Genge stated, for example:

> And also, you will recall Mr. Nathan [Treadwell's lawyer] pointed out for you that at Mr. Jacoby's sentencing, I referred to him or I characterized his own testimony at his trial as perjurious and I characterized him as a perjurious witness at that point.
>
> And Mr. Nathan is going to make a big issue out of that, but again, ultimately, it isn't. That's sort of a side issue in a sense, because ultimately it is important for you to determine whether Mr. Jacoby testified truthfully before you in this case. That's going to be for you really to decide.
>
> Now, clearly, I mean, Mr. Jacoby did commit perjury at his first trial and no one can condone that, but I think we can all to some extent perhaps understand that someone is going to lie to protect himself, but will that person also like [sic] under oath to protect—not to protect, but, in fact, to convict innocent people?

R57 at 7758. Bearing in mind the considerable importance of Jacoby's testimony, Jacoby's credibility thus was a focal point for both the prosecution and the defense. The prosecution expressly presented Jacoby as someone who had lied at his own trial but, in this case, had no reason, motive, or inclination to lie. The defense, in its attempts to impeach Jacoby's credibility, was armed with little more than a reiteration of the prosecution's openly acknowledged characterization of Jacoby as a "brazen perjuror" at his criminal proceeding. Given the fact that the government had elicited from Jacoby information regarding his previous history of giving perjured testimony, it was reasonable for the jury to assume that it now knew the most damaging available information about Jacoby's believability.

---

is therefore unlikely that Jacoby did not comprehend the crucial role that the government plays in sentence reductions.

In reaching a determination that the prosecutor's remarks in this instance constituted material impeachment evidence that affected the integrity of these proceedings, it is important to emphasize what the case is *not* about: Although Jacoby testified under immunity, this case does *not* involve any other type of cooperation agreement that Jacoby might have breached while on the witness stand. Indeed, Jacoby repeatedly disavowed the existence of any agreement or promise by the government in exchange for his testimony. To be sure, Jacoby may have hoped for or expected to derive some future benefit from giving testimony favorable to the government, but there was no outstanding agreement between Jacoby and the government at the time of his testimony. We reiterate this point for the following reason: Although we do not countenance prosecutorial threats or intimidation of witnesses under any circumstances, we do acknowledge that, where a witness has agreed to cooperate with the government and give certain testimony in exchange for a reduction in sentence or probation, for instance, but fails to give the proffered testimony, it would hardly be unusual or inappropriate for the prosecutor to remind the witness of the terms of their agreement. In this instance, however, there was no agreement or promise about which the prosecutor may have been "reminding" Jacoby. The record is devoid of any reference or indication that Jacoby reasonably should have feared that his probation would be revoked entirely based on the nature of his testimony. It is therefore difficult for us to construe Genge's comments as anything other than an attempt to intimidate Jacoby into testifying "correctly."

It is also critical to observe that, whether Genge intended his remark to intimidate Jacoby or, as Jacoby later testified, to be a "joke" is immaterial to our analysis. The record supports the inference that Jacoby understood the remark to be a threat, and we have little difficulty concluding that Scheer could have used this information to undermine the credibility of a witness whose

24

credibility was already a prominent issue in the case. Moreover, it is worth noting that the record also supports the inference that Jacoby had ample reason to take Genge's remarks seriously. Jacoby testified at the evidentiary hearing that he was aware, while in prison, that the government had at first given Treadwell, a Blank, Rome partner and one of Scheer's co-defendants, full immunity in exchange for his cooperation but, subsequently, revoked the immunity and indicted him along with Scheer. R64 at 133-34. For purposes of this discussion, the fact that Jacoby knew—prior to his conversation with Genge regarding the necessity that Jacoby provide "cooperative" testimony—that the government had revoked its promised immunity to Treadwell lends credence to the possibility that Jacoby genuinely was fearful that Genge could—and might—carry out his threat to return Jacoby to jail.[14]

In sum, we are convinced that Scheer's knowledge of the incident between Genge and Jacoby, at which Genge intimated that Jacoby's failure to testify in a "cooperative" fashion might result in his return to prison, was material information that might have substantially undermined the critical value of Jacoby's testimony. As a result, the government's failure to communicate this information to Scheer effectively undermines our confidence in the integrity of the verdict. *See Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566 ("One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."). Had Scheer been able to use knowledge of this incident to impeach the

_____

[14]In its post-trial order, the district court found that the government had nullified Treadwell's immunity agreement in bad faith and had breached the terms of the agreement. R4-817 at 20 & 28. Consistent with this determination, the court reinstated Treadwell's immunity and dismissed the indictment against him.

credibility of this critically important witness, whose credibility had already been called into question by the government, there is a reasonable probability that the outcome of the proceeding would have been different.

## III. CONCLUSION

Scheer asks that we set aside his convictions for misapplication of bank funds and making false statements on an application for funds to a bank.  Having reviewed the extensive record in this case, we conclude that the prosecutor's potentially intimidating remarks to a critical government witness undermines our confidence in the verdict such that, had information regarding this incident been known to Scheer at the time the incident allegedly occurred, there is a reasonable probability that the result of the proceeding would have been different.  We therefore REVERSE Scheer's convictions and REMAND this case for a new trial.